UNITED STATES of America

v.

Charles W. RAMSEY, Appellant.

UNITED STATES of America

v.

James W. KELLY, Appellant.

Nos. 75–1275, 75–1276 and 75–1691.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 10, 1975.

Decided June 10, 1976.
Certiorari Granted Oct. 4, 1976.
See 97 S.Ct. 56.

Allan M. Palmer, Washington, D.C., for appellant in Nos. 75–1275 and 75–1276.

Irving R. M. Panzer, Washington, D.C. (appointed by this court), for appellant in No. 75–1691.

John W. Polk, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., John A. Terry and Timothy J. Reardon III, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before McGOWAN, TAMM and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

Dissenting opinion filed by Circuit Judge ROBB.

McGOWAN, Circuit Judge:

Appellant Ramsey was convicted in the District Court on one count of unlawful importation of heroin (21 U.S.C. § 952(a) (1970)); three counts of unlawful use of a communication facility (21 U.S.C. § 843(b) (1970)); one count of possession of heroin with intent to distribute (21 U.S.C. § 841(a) (1970)); one count of unlawful receipt and possession of a firearm (18 U.S.C.App. § 1202(a)(1) (1970)) and one count of unlawful possession of a pistol (22 D.C. Code § 3203 (1973)). Appellant Kelly was convicted on one count of unlawful importation, one count of unlawful use of a communication facility, and one count of possession with intent to distribute. On appeal, a number of allegations of error are made, one of which we find to be of merit, and we therefore reverse the convictions.

I

The case was tried to the District Judge on the basis of a lengthy stipulated record which we need summarize only in broad outline. In November of 1973, Sylvia Bailey and William Ward,[1] who resided in West Germany, were engaged in international

---

1. Bailey and Ward were indicted with appellants, but have never been available in the United States for trial.

narcotics trafficking. They were subjected to electronic surveillance pursuant to a West German court order, and the wiretap led to a search of Ward at the Munich Airport in December of 1973, which turned up no drugs but $10,000 in cash. The wiretap was reactivated in January of 1974, and among the calls intercepted were incriminating trans-Atlantic conversations concerning narcotics between Bailey and appellant Ramsey.

Ward and Bailey travelled to Thailand in late January of 1974, and Thai officials were alerted to their presence by West German agents. The Thai officials placed them under surveillance, and observed Ward mailing letter-sized envelopes in six different mail boxes. Five of these envelopes were recovered, and among the addresses they bore was a mail drop in Washington, D.C. later linked to appellants. On February 2, 1974, Bailey and Ward were arrested in their hotel room in Thailand, and seized in the raid were all the ingredients for the narcotics importation scheme. Among the items so obtained were numerous sealed, heroin-filled envelopes, eleven of which bore Washington, D.C. addresses with which appellants were later found to have a connection.

Two days later in New York—independently and without any knowledge of the foregoing—Customs Inspector George Kallnischkies seized and, proceeding without a warrant, opened eight envelopes found to contain heroin. The envelopes had been mailed from Thailand and were destined for four addresses in the Washington area. These envelopes were resealed and forwarded to Washington, and six were delivered to three addresses. Federal agents witnessed Kelly retrieve all six envelopes, rendezvous with Ramsey at the latter's residence, and transfer to Ramsey a brown paper bag. The agents moved in and arrested both men. The paper bag was found to contain the six letters, $1,100 in cash, and cutting material. Also seized from Ramsey was a notepad with Bailey's phone numbers and addresses. The next day, in executing a search warrant on Ramsey's residence, the agents recovered, *inter alia*, the two pistols for whose unlawful possession Ramsey stands convicted and a cardboard sheet with Sylvia Bailey's phone numbers.

## II

The critical issue in this case, in our view, is the warrantless search of the eight envelopes at the New York Post Office. Those envelopes, and a great deal of evidence deriving from their seizure, were presented before the trier, and no attempt is or could fairly be made by the Government to argue that, if the seizure was illegal under the Fourth Amendment, the error was harmless as to any of the counts. As we proceed to develop, we believe that the opening of these letters without resort to a warrant procedure was a constitutional violation, and the use at trial, over the objection of appellants, of evidence obtained thereby requires overturning the convictions.[2]

Inspector Kallnischkies was a supervisor of Customs Service Inspectors dealing with international letter class mail (the category closest to domestic first class mail). He testified that foreign airmail mail coming to the New York General Post Office is placed on a conveyor belt for sorting, and during that process he would remove any items that looked "suspicious." Tr. of October 25, 1974 Hearing, at 6. In this instance, he removed eight envelopes from the belt because they were from Thailand—a known source of heroin—and were bulky.[3] *Id.* at 7. He weighed one of the envelopes and

---

2. The Government remains free, of course, to retry appellants if there exists sufficient evidence, aside from the illegally seized envelopes and fruits of that seizure, to warrant such a course.

3. Kallnischkies testified that often he could feel cardboard inside an envelope, and that if there is a bag of heroin concealed inside, shaking the envelope will cause the bag to fall into one particular spot. Tr. at 33. He could not specifically say in the case in question that he felt anything other than the bulkiness of the envelope. *Id.* at 34.

found it to weigh 42 grams, roughly three times the weight of a normal letter. *Id.* at 8–9. The envelope also "felt like there was something in there. . . ." *Id.* at 9. He then opened one envelope and found a plastic bag containing white powder between some pieces of cardboard. Upon testing, the powder was found to be heroin. The other envelopes also were found to contain heroin.

■ The Government would place this search within the border search exception to the warrant requirement. The view that *packages* moving through international mail fall within the border search exception has been uniformly adopted by courts confronting that question. *E. g., United States v. Doe,* 472 F.2d 982, 984 (2d Cir.), *cert. denied,* 411 U.S. 969, 93 S.Ct. 2160, 36 L.Ed.2d 691 (1973); *United States v. Galvez,* 465 F.2d 681, 687 (10th Cir. 1972); *United States v. Beckley,* 335 F.2d 86, 88–89 (6th Cir. 1964), *cert. denied,* 380 U.S. 922, 85 S.Ct. 921, 13 L.Ed.2d 807 (1965); *United States v. Swede,* 326 F.Supp. 533, 535–36 (S.D.N.Y.1971); *United States v. Sohnen,* 298 F.Supp. 51, 54–55 (E.D.N.Y.1969). The last-mentioned court, (Weinstein, J.), indicated that it might reach a different result where letters, rather than packages were involved. *United States v. Sohnen, supra,* at 55.

However, two circuits have squarely ruled that international letter mail, like international package mail, does fall within the border search exception. *United States v. Bolin,* 514 F.2d 554, 557 (7th Cir. 1975),

*citing United States v. Odland,* 502 F.2d 148, 151 (7th Cir.), *cert. denied,* 419 U.S. 1088, 95 S.Ct. 679, 42 L.Ed.2d 680 (1974); *United States v. Barclift,* 514 F.2d 1073, 1074–75 (9th Cir.) (per curiam), *cert. denied,* 423 U.S. 842, 96 S.Ct. 76, 46 L.Ed.2d 63 (1975). *See also United States v. Francis,* 487 F.2d 968 (5th Cir. 1973), *cert. denied,* 416 U.S. 908, 94 S.Ct. 1615, 40 L.Ed.2d 113 (1974).[4] Both of these circuits rested their analysis on nothing more than the assertion that no meaningful difference could be drawn between the entry of mail into the United States and the entry of automobiles, baggage, individuals, or packages.

■ In our view, that assertion is sustainable only by embracing the most sweeping concept that the "integrity of our borders" requires that all objects crossing them may be searched at the whim of the Government. If, in fact, we look to the rationale of the border search exception, we find that it is based upon (1) the impracticability of requiring a warrant given the huge volume of items moving across the border likely to contain contraband, *e. g., United States v. Doe, supra,* at 982–83; *Morales v. United States,* 378 F.2d 187, 190 (5th Cir. 1967), and (2) the difficulty of obtaining a warrant when the subject of the search is mobile, as a car or person, *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925).[5]

■ When we compare letters to persons or automobiles it becomes apparent how little force this rationale carries when ap-

---

4. At page 9 of its brief, the Government notes that the Supreme Court has refused to limit the power to search international mail upheld in *Odland, Francis,* and *Doe.* The inference that we are unmistakably invited to draw is that the Supreme Court's denial of certiorari should be viewed as an endorsement of the result and perhaps the reasoning of these cases. That is an invitation which, as we ought not to have to remind the Government, conflicts with the elementary theory of certiorari review.

5. Other rationales for this longstanding exception have been suggested. One, the theory that a well-established history of warrantless searches can exempt the practice in question from the ordinary requirement of a warrant, was squarely rejected in *Camara v. Municipal*

*Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), in which the Court ignored the argument based on history on which it had relied eight years earlier in *Frank v. Maryland,* 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959). A second suggestion, that travelers have a less strong expectation of privacy and hence warrantless searches are acceptable, *see, e. g., United States v. Sohnen, supra,* at 55; Note, *Border Searches and the Fourth Amendment,* 77 Yale L.J. 1007, 1012 (1968), is largely circular, assuming the existence of such searches as part of the justification for them; and, in any event, the rationale would not apply to searches of letter class mail, *see* pp. 419–420 *infra.*

# 419

plied to letters. There are limited kinds of contraband that can be concealed within a letter-sized envelope; the decided cases appear to involve almost exclusively narcotics, although it is perhaps conceivable that small pieces of jewelry, small quantities of precious metals, or currency might also be concealed. There is, therefore, a smaller likelihood in the first instance that a letter, rather than an automobile or a suitcase, contains contraband. Moreover, as far as the central problem of narcotics is concerned, the Customs Service can effectively use trained dogs who can detect the smell of contraband drugs. *See, e. g., United States v. Mitchell*, 525 F.2d 1275, 1277 (5th Cir. 1976); *United States v. Fulero*, 162 U.S.App.D.C. 206, 498 F.2d 748 (1974) (per curiam); *United States v. Feldman*, 366 F.Supp. 356, 358 (D.Hawaii 1973). Similarly, X-ray examination, or metal detectors like those currently in use at airports, could detect precious metals or jewelry. *See, e. g., United States v. Chiarito*, 507 F.2d 1098, 1099 (5th Cir.) (per curiam), *cert. denied*, 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *United States v. Sohnen, supra*, at 53. These techniques could screen out a large percentage of otherwise suspicious mail that, under current practice, is routinely opened. The dimensions of the remaining problem of smuggling in letter-sized envelopes are of a different order than those of other kinds of traffic across the border.[6]

Furthermore, suspicious-looking letters (and, to be sure, packages as well), unlike more mobile automobiles or travellers, can easily be detained to permit further examination (as with dogs, magnetometers, or X–rays) or to obtain a warrant. In *United States v. Van Leeuwen*, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970), the Supreme Court unanimously upheld the authority of officials to detain first class mail for a period of 29 hours while they investigated suspicious circumstances and obtained a search warrant. Given this holding, it would appear to be an *a fortiori* case for Customs Inspectors to detain *international* letter mail for a reasonable period in which to investigate and, if appropriate, to obtain a warrant.

■ It thus seems that searches of international letter mail at best strain the ra-

**6.** There is, of course, no ready line available to distinguish letters from packages; the distinction is one of degree. We are satisfied that the envelopes in this case, five of which measured roughly seven by five inches and a sixth of which measured nine by four and one-half inches, Government Exhs. 35–40, were in size and appearance closer to the letter end of the spectrum and fell outside of the border search exception.

The Postal Regulations currently limit international letter class mail to pieces not in excess of four pounds (except that for Canada there is a sixty pound limit) and with a maximum length of 24 inches and a maximum length, breadth and thickness, combined, of 36 inches. 39 C.F.R. §§ 22.1(b), (c)(1) (1975). In our view, the Government could be sure of complying with the Fourth Amendment by treating all international letter class mail as outside the border search exception. It might be objected that many pieces within that class are much more like "packages" than "letters," and that therefore a narrower class of items outside the exception must be defined. That point surely carries force, but the difficulty is most easily solved in the first instance by governmental attempts to formulate a dividing line that more appropriately separates "packages" and "let-

ters." To be sure, even the most acceptable definition will be arbitrary at the margin, as is true of most difficult line-drawing problems. But that presents no reason for drawing no line at all and thereby giving no weight whatsoever to the important privacy and expressive interests. *See Haddock v. Haddock*, 201 U.S. 562, 631–32, 26 S.Ct. 525, 553, 50 L.Ed. 867 (1906) (Holmes, J., dissenting) ("I have heard it suggested that the difference is one of degree. I am the last man in the world to quarrel with a distinction simply because it is one of degree. Most distinctions, in my opinion, are of that sort, and are none the worse for it. But the line which is drawn must be justified by the fact that it is a little nearer than the nearest opposing case to one pole of an admitted antithesis.") And in most cases, a piece of mail will clearly fall on one side of a common sense dividing line between "letters" and "packages." *See, e. g.*, Tr. of Oct. 25, 1974 Hearing, at 23.

We believe that a careful attempt to define subclasses of international mail by the Government, so as to clearly separate "packages" from "letters," can provide sufficient certainty; and in cases where uncertainty persists, the Government can deal with it by avoiding brinksmanship and instead taking the preferred course of seeking a warrant.

tionale of the border search exception. Like all exceptions to the warrant requirement, *see generally, e. g., United States v. United States District Court,* 407 U.S. 297, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958), the border search exception must be carefully and narrowly drawn. The Supreme Court has in recent years twice declined to take an expansive view of the border search exception or the authority of the Border Patrol. *See United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). And as in the Court's most recent decision, in the instant case we are "not convinced that the legitimate needs of law enforcement require this degree of interference with lawful traffic." *United States v. Brignoni-Ponce, supra,* at 883, 95 S.Ct. at 2581.

■ Finally, and probably most important, letter mail is a vital means of communication in our society. Letters express the most important and sensitive of our personal, familial, political, professional, and financial affairs. They implicate both our deepest privacy and our interest in free expression, far more than packages or suitcases or automobiles. In the words of Justice Holmes, "the use of the mails is almost as much a part of free speech as the right to use our tongues." *United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson,* 255 U.S. 407, 437, 41 S.Ct. 352, 363, 65 L.Ed. 704 (1921) (Holmes, J., dissenting), *quoted with approval in Blount v. Rizzi,* 400 U.S. 410, 416, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971), *and United States v. Van Leeuwen, supra,* at 251.

■ Even if the ordinary practice of the Customs Service is not to read the mail that is opened, *see* note 9 *infra,* mere knowledge on the part of individuals of the practice of routinely opening mail inhibits the exercise of free speech. *See Procunier v. Martinez,* 416 U.S. 396, 423, 94 S.Ct. 1800,

40 L.Ed.2d 224 (1972) (Marshall, J., concurring); *cf. Talley v. California,* 362 U.S. 60, 65, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); *NAACP v. Alabama,* 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). And the Supreme Court has indicated that limits on search and seizure must be especially strong where First and Fourth Amendment values converge. *See, e. g., United States v. United States District Court, supra,* at 313–14, 92 S.Ct. 2125; *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

The Court has also noted, with reference to the need to enforce Fourth Amendment protections, that "[h]istory abundantly documents the tendency of Government—however benevolent and benign its motives—to view with suspicion those who most fervently dispute its policies." *United States v. United States District Court, supra,* at 314, 92 S.Ct. at 2135. The recent disclosures about the widespread illegal searches of mail by United States intelligence agencies, *see, e. g.,* Report to the President by the Commission on CIA Activities Within the United States [the Rockefeller Commission], June 1975, at 101–15, 168; S.Rep.No. 755, 94th Cong., 2d Sess., Book II, at 12, 17, 38, 62, 107–08 (1976); *id.,* Book III, at 559–677; *Hearings before the Senate Select Comm. to Study Governmental Operations with Respect to Intelligence Activities,* 94th Cong., 1st Sess., Vol. 2, at 1–2, 15–16, 51–63, 66, 76 (1975); *id.,* Vol. 4, at 2, 4, 6–7, 10–11, 21–22, 31–35, 38, 43, 148, 150, 163; *id.,* Vol. 6, at 202–06, 367, highlight the importance of the Supreme Court's observation. The Supreme Court has also stated, as one reason supporting its requirement that warrants be obtained for electronic surveillance related to the domestic aspects of national security, that "[b]y no means of least importance will be the reassurance of the public generally that indiscriminate wiretapping and bugging of law-abiding citizens cannot occur." *United States v. United States District Court, supra,* at 321, 92 S.Ct. at 2139. Routine opening of international mail presents the same threat to First Amendment interests, and enforcing the protections of the Fourth Amendment can

provide law-abiding citizens with the same important assurance.

■■ It thus appears that there is not a sufficient need, and there is too great a risk to personal privacy, to extend the border search exception to permit unrestrained opening of international mail.[7] We believe that the values protected by the First and Fourth Amendments demand that, before international letter mail is opened, a showing of probable cause[8] be made to and a warrant[9] secured from a neutral magistrate.

■ Any suggestion that adherence to the warrant requirement would serve no purpose in a case like the one at bar cannot be sustained. If the suggestion is directed merely against the clear recognition of the independent force of the Fourth Amendment's warrant clause, it cannot be persuasive. And there are at least three distinct functions that a warrant procedure would serve. First, by requiring that the inferences to which law enforcement officials are entitled be drawn by neutral magistrates rather than by officers in the heat of duty, see Johnson v. United States, supra, at 13–14, 68 S.Ct. 367, 368–369, 92 L.Ed. 436, it helps to limit unjustified intrusions upon the private and communicative material contained in letter mail. Second, it creates a record of the circumstances justifying an opening before the search occurs; this record minimizes the burden of post facto judicial review, United States v. United States District Court, supra, at 321, 92 S.Ct. 2125, and sharply limits the possibility that officials will attempt to justify a search by what it turns up rather than what was known beforehand, see, e. g., United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948). Inspector Kallnischkies' inability to remember precisely the basis upon which he determined to open the letters in question, see note 3 supra, illustrates the importance of this purpose.

■ Finally, establishment of a warrant machinery is a bulwark against the enlistment of mail openings not on behalf of responsible law enforcement, but rather to serve other, less commendable purposes. In Almeida-Sanchez, the Supreme Court re-

---

7. The fact that the search in this case might be authorized by 19 U.S.C. § 482 (1970) is of no consequence, for it is well established that " 'no Act of Congress can authorize a violation of the Constitution.' " United States v. Brignoni-Ponce, supra, at 877, 95 S.Ct. at 2578, quoting Almeida-Sanchez v. United States, supra, at 272, 93 S.Ct. 2535.

8. Adherence to a probable cause standard should not hamstring the Government; indeed, we believe that the facts in this case are such that, had they been presented to a magistrate, issuance of a search warrant permitting opening of the envelopes would have been appropriate. Here, as elsewhere, "[i]n dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); accord, e. g., Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969):

. . . we do not retreat from the established propositions that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, Beck v. Ohio, 379 U.S. 89, 96, [85 S.Ct. 223, 13 L.Ed.2d 142] (1964); . . . that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, United States v. Ventresca, 380 U.S. 102, 108, [85 S.Ct. 741, 13 L.Ed.2d 684] (1965). . . .

A by no means exclusive list of facts that tend to establish probable cause would be: the size of the letter; whether inspection by X-ray or sniffing by a trained dog corroborates any suspicion; whether feeling the package from the outside gives reason to suspect contraband; the country of origin; an unusual and suspicious address or return address; an unusual number of letters sent from and/or to the same address within a short period of time; a reasonable basis to believe that the sender or recipient is engaged in smuggling; and so forth.

9. Such warrants would, of course, almost always be limited to inspecting the mail for contraband and would not authorize the reading of any communication contained inside. 19 C.F.R. § 145.3 (1975) currently prohibits the reading of correspondence in sealed letter mail absent a warrant specifically authorizing that action, although it appears that there is no sanction accompanying that prohibition.

minded us of Justice Jackson's words shortly after returning from the Nuremberg trials:

These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catelog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.

413 U.S. at 274, 93 S.Ct. at 2540, *quoting Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting). To advert again to the documented abuses by American intelligence agencies in conducting mail searches does not reflect an obsession with current headlines, but rather highlights the importance of our duty to enforce the Fourth Amendment's protection of individual privacy and security.[10]

The Government has suggested that a warrant requirement would be impracticable, but there is absolutely nothing in the record to support this assertion. No proof has been adduced to show, and we have no reason to believe, that using X-ray inspection, metal detectors, specially trained dogs, and the like to dispel suspicion, raised by external appearance, that a letter contains narcotics, the remaining number of pieces of suspicious-looking letter mail is overwhelming. Moreover, a warrant procedure need not be unduly burdensome. A Customs Inspector could each morning display to a magistrate letters from the previous day's mail that he wished to open and indicate his reasons for so wishing; conceivably, the warrant procedure could be conducted entirely orally so long as a complete record was maintained; the Government could station a magistrate on a regular full

or part-time basis at such centers as the New York Post Office, where the volume of mail is heaviest. Other techniques both to facilitate examination of letters short of opening them and to streamline the warrant process might be devised.

In light of all of these seemingly feasible alternatives, we are unpersuaded by the Government's argument. Indeed, that argument is seriously compromised by the fact that, after the seizure in New York of the eight envelopes, officials at the Washington, D.C. Post Office were alerted; and when they intercepted three similar envelopes, *they sought and obtained a search warrant.* The course they chose to take strikes us as responsive to the Supreme Court's repeated admonitions that the warrant requirement "is not an inconvenience to be somehow 'weighed' against the claims of police efficiency," *Coolidge v. New Hampshire, supra,* at 481, 91 S.Ct. at 2046; that the inconvenience and delay involved in obtaining a warrant are "never very convincing reasons" for failing to obtain one, *Johnson v. United States, supra,* at 15; that "the Constitution recognizes higher values than speed and efficiency," *Stanley v. Illinois,* 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972); and that

The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards.

*Almeida-Sanchez v. United States, supra,* at 273, 93 S.Ct. at 2540.

The fact that the authorities locally in this jurisdiction observed, apparently without difficulty, the warrant requirement in like circumstances underscores the lack of cogency in appellees' suggestion that we are faced with one of those relatively few

---

10. As Judge Prettyman noted many years ago, "[W]e are dealing with doctrines and not with the presumable taste and sense of individual officials. Maybe none of these examples would ever occur. But the question before us is not whether they would happen but whether they legally could."

*District of Columbia v. Little,* 85 U.S.App.D.C. 242, 178 F.2d 13, 18–19 (1949), *aff'd on other grounds,* 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599 (1950).

instances in which adherence to the warrant requirement is genuinely impracticable. There is no question that international letter mail presents a serious threat to effective drug law enforcement. But successful containment of that threat does not require abandonment of the Fourth Amendment.

 The judgments of conviction are reversed and the cases remanded to the District Court for further proceedings consistent herewith.

*It is so ordered.*

ROBB, Circuit Judge (dissenting):

I regret that I am unable to join in the thoughtful and scholarly majority opinion. A few words will indicate the reasons for my dissent.

Searches classified as border searches have always been free of both the warrant and the probable cause requirements of the Fourth Amendment. *Boyd v. United States*, 116 U.S. 616, 623, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (Majority Op.), 287–88, 93 S.Ct. 2535, 37 L.Ed.2d 596 (Dissenting Op.) (1973); *United States v. Beckley*, 335 F.2d 86 (6th Cir. 1964), *cert. denied, sub nom., Stone v. United States*, 380 U.S. 922, 85 S.Ct. 921, 13 L.Ed.2d 807 (1965); *See Zweibon v. Mitchell*, 170 U.S.App.D.C. 1, 38–39, n. 93, 516 F.2d 594, 631–32, n. 93 (1975).[1] This means that a traveller and his luggage and effects may be subjected to a reasonable search, without a warrant, when he crosses the border. The search may of course extend to packages he is carrying, and I think he may reasonably be required to open a sealed envelope carried in his pocket or handbag; that the contents to be inspected are enclosed in an envelope, rather than by wrapping paper and twine, cannot be of critical significance. If I am right

about this then I think a sealed envelope acquires no additional protection or immunity from search because it moves through international mail, rather than in a traveller's luggage or on his person. There is no more reason to require a warrant in one case than in the other.

The majority argues that warrants authorizing the opening of letter mail may be obtained with ease. Yet this argument applies equally to packages and envelopes, and the majority does not deny that packages crossing the border in the mail may be opened without a warrant. Furthermore, the First Amendment considerations emphasized by the majority apply also to packages, for writings of a sensitive and personal nature, such as diaries, political tracts, and the like may be transmitted in wrappings rather than envelopes.

From what has been said it follows that I agree with the decisions of the circuit courts of appeals for the seventh and ninth circuits in *United States v. Bolin*, 514 F.2d 554, 557 (7th Cir. 1975); *United States v. Odland*, 502 F.2d 148, 151 (7th Cir.), *cert. denied*, 419 U.S. 1088, 95 S.Ct. 679, 42 L.Ed.2d 680 (1974); and *United States v. Barclift*, 514 F.2d 1073, 1074–75 (9th Cir.) (per curiam), *cert. denied*, 423 U.S. 842, 96 S.Ct. 76, 46 L.Ed.2d 63 (1975). Unless and until the Supreme Court repudiates those decisions I would not do so.

---

1. Citing *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) the majority suggests that the Supreme Court has abandoned "the argument based on history". The Camara case however involved a warrantless entry by a housing inspector in San Francisco; it did not involve a border search. The opinion for the Court was written by Mr. Justice White. In *Almeida-Sanchez v. United States*, 413 U.S. 266, 287–88, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) Mr. Justice White, dissenting, forcefully stated and approved the historical underpinnings of border searches.