Frank **CAVEY**

v.

Mark **LEVINE**, Commissioner, and Ralph **L. Williams**, Warden and Marcellus **Moore**, Assistant Warden, and Lieutenant **Mooney**.

Civ. No. Y–76–1790.

United States District Court, D. Maryland.

May 24, 1977.

---

Frank Cavey, pro se.

Stephen B. Caplis, Asst. Atty. Gen., Baltimore, Md., for defendants.

## MEMORANDUM AND ORDER

JOSEPH H. YOUNG, District Judge.

The plaintiff, Frank D. Cavey, currently an inmate at the Maryland Correctional Institute, has filed a civil rights action, pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343, alleging violations of his constitutional rights by the defendants while the plaintiff was an inmate at the Maryland House of Correction during September and October 1976. The plaintiff has alleged violations of his rights under the First, Eighth and Fourteenth Amendments of the United States Constitution and has requested declaratory relief, compensatory and punitive damages for the disciplinary actions taken against him following the sending of a letter to the Warden and Assistant Warden of the institution, defendants Williams and Moore, respectively. The defendants have moved for summary judgment and the plaintiff has cross-filed for summary judgment, indicating in his motion that he wished to abandon his request for a jury trial and would accept this Court's ruling on matters of fact and law which pertain to his case.

### I.   Undisputed Facts

Plaintiff Cavey was in a cell in the Special Confinement Area [SCA] of the Maryland House of Correction on the night of September 8–9, 1976. At approximately 2 a. m., another inmate, Thomas McMahon, who was also confined in SCA, began vocalizing in an agitated manner. This inmate had attempted to hang himself earlier that night. At approximately 5 a. m., McMahon killed himself in his cell. The plaintiff states that McMahon climbed to the top of his cell and threw himself headfirst onto the concrete floor; the defendants do not dispute this fact in their motion for summary judgment.

Later during the day of September 9, 1976, the plaintiff wrote a letter to the Assistant Warden, defendant Moore, a facsimile of which accompanied the defendants' motion for summary judgment, which reads:

Mr. Moore          Sept. 9

*No Compassion What So Ever*

On 2 o'clock Wensday morning a inmate in a suicide cell begs Ltd. Mooney for a few minutes of his time. It is quite [quiet] and you can here what he is saying. "Ltd. Mooney can I see you? can I see you Ltd. Mooney? can I see you Ltd. Mooney? Please. Don't leave Ltd. Mooney. Please don't leave. Please let me see you for just a minute. By the way the inmate is talking you realize he is in a state of acute depression and may have any number of mental problems. The suicide cell is used for an observational cell for inmates who are going through various stages of depression. But does Ltd. Mooney give this man one minute of his time. No. No compassion what so ever.

At 5 o'clock on this same morning the inmate climbs the bars in his cell, dives to the floor, crushes his skull, and dies. What a waste. What a shame. But does anyone care? If Ltd. Mooney would have given this man one minute of his time is it possible this tragedy could have been avoided? Who knows.

I think it is about time the state should take the suicide cells into consideration. If the cells where padded a life could not be taken. Maybe the state does not what [want] to pay the money to pad a cell? Maybe they feel a human life is not worth the money?

You can either have this printed in the New Letter or the New Post and Sunday Sun. The choice is yours. If it is not printed in the News Letter I will also send a copy of this to the inmates family.

Respectfully

Frank Cavey

# 123–599

S.C.A. # 45

A similar letter, identical except for minor grammatical changes, was addressed and sent to "Mr. Williams" [defendant Ralph Williams, Warden of the Maryland House of Correction]. Williams forwarded a copy of the letter he had received to Major Brown, Shift Commander and to a "Mr. Byrne AW.S&C" with the notation:

Interview, investigate, & take the action necessary & appropriate

False info. & what other violations of rules & regulations. [Copy of Williams' letter from Cavey with affidavit of Marlin F. Bachtell, Assistant Superintendent II of Maryland Correctional Institution indicating its authenticity, filed as an exhibit by the defendants at the request of the Court.] Defendant Moore forwarded a copy of the letter he had received from Cavey to Major Leon Brown, with the notation in his handwriting at the top "Please look into this matter". [Affidavit of Moore regarding handwriting and copy of letter as defendant's exhibit, filed in this case.]

On September 14, 1976 Major Brown referred the letter to Richard E. Vernon, Lieutenant, for an investigation. Vernon interviewed Cavey and submitted a report to Major Brown on September 15, 1976 [Exhibit to defendants' motion for summary judgment.] The report indicates that Cavey felt strongly about the incident, intended the letter to bring the condition of the suicide cells to the administration's attention and not to make charges against Lieutenant Mooney and that Cavey had not altered his story about what had occurred. The report refers to another report of the incident, filed by Lt. Mooney on September 9, 1976. [Exhibit filed with defendants' motion for summary judgment.] The report notes that Thomas McMahon was, at 12:10 a. m. September 9, 1976, attempting to hang himself with his bedsheets, that Mooney was called to the scene at that time and tried to calm the inmate down but that the inmate stated he did not want to talk and would talk to Mooney "later on". Mooney reported that he complied with this request and the inmate appeared to "relax to some extent". The last sentence of the Mooney report reads:

This conversation took place approximately 2:00 A.M. and on both occasions Sgt. Wharrey was instructed to keep this man under close observation at both times.

This sentence appears to have been typed at a different time than the rest of the report-the ribbon quality is darker and the line alignment altered. It appears that the officer typed in his name at the bottom of the page when he made the first entries in the report. It is unknown when the final sentence was added.

Lt. Vernon's report to Major Brown goes on to state Vernon's feeling that Cavey could not have heard what, if anything, Mooney said to McMahon. Cavey disputes this, stating that the SCA was like an "echo chamber". Vernon mentions that Cavey may have been sleeping between 2 a. m. and 5 a. m. when the inmate committed suicide. This assertion does not put into dispute any of Cavey's allegations in his letter. Vernon ends his report by asking Brown to advise whether an infraction report should be submitted for Cavey's having made allegations against Lt. Mooney and his "threat of sending the letter to the inmate's family if the letter is not published in the Newsletter". Vernon suggests three rules infractions: disobeying an order, use of threatening language and giving false information.

Apparently Brown indicated approval, for charges on each of these rules were brought against Cavey, labelled "major" infractions and submitted to the Adjustment Team. Cavey appeared at the hearing, where Lt. Vernon gave a statement of the facts, referring the Adjustment Team to the copy of Warden Williams' letter from Cavey with the Warden's "comments". The record of the questions asked Cavey and his replies indicates that Cavey affirmed that he had told "them" that if the letter was not published he would "send it to the man's family". Cavey re-asserted his version of the facts and his belief that he had given truthful information. [The Classification Adjustment Team report and worksheets are exhibits in the case, filed with the defendants' motion for summary judgment.] The team found Cavey guilty of use of threatening language and disobeying an order. (Rules 3 and 1) He received 15 days in segregation as punishment.

Lieutenant Vernon has provided information about the three rules involved in the charge against Cavey. [Letter of Vernon to John R. Byrne, January 17, 1977, submitted as an exhibit at the Court's request.] Vernon explains that upon being found guilty of breaking any prison rule or regulation, the inmate is considered to have "disobeyed" an order, and broken Rule 1. Vernon's comments on the substantive violations read as follows:

Violation #3. *"Use of threatening Language"*

This violation was based on the contents of Cavey's letter where in fact he said he would submit this false episode to the newspapers and send the letter to the inmate's family. This statement was enterpreted as a threat of action if certain demands were not met. Namely, padded cells be placed in the Special Confinement Area. If such a false episode is submitted to the civilian news media as well as the inmates newspaper, it could lead to bad publicity for the institution and perhaps if read by the inmates would produce unrest among the general population.

Violation #22. *"Giving false Information"*

This violation was based on Cavey's statement that Lt. Mooney did nothing for the suicidal inmate, wheras it was found and documented that Lt. Mooney did in fact, talk to the inmate and then take precautionary measures.

In the letter Vernon confirms that Warden Williams' comments on Cavey's letter were submitted to the Adjustment Team at the same time as the infraction report.

## II. The Plaintiff's Legal Claims

As clarified in his cross motion for summary judgment, Cavey claims that his right of freedom of speech was violated when he was punished for exercising that right by being sent to "lock up" for fifteen days. He asserts this also constitutes cruel and unusual punishment and a violation of his

due process rights. In an earlier document submitted in this case, Cavey also argued that a finding of guilty of disobeying an order "because he is found guilty of disobeying any order" constitutes being punished twice for the same "crime" and subjects him to double jeopardy. [Plaintiff's Motion in Contra, filed February 14, 1977]

### A. Personal Participation of the Defendants

■ Defendants Levine and Moore have moved for summary judgment on the grounds that the plaintiff has failed to ascribe to them any active role or knowing acquiescence in an intentional deprivation of the plaintiff's civil rights. The plaintiff has made no claim that defendant Levine had any personal knowledge of the incidents involved in this case. Defendant Moore apparently merely forwarded a copy of the letter he received from Cavey to Major Brown asking him to "please took into this matter". That request, standing alone, constituted an appropriate and totally innocuous action on the part of an assistant warden who has received a disturbing letter about the circumstances surrounding the suicide of an inmate. Moore's request contained no directive to Brown to begin disciplinary actions against Cavey, albeit there may have been an unexpressed license granted. There are no documents before the Court which link defendant Moore in any further fashion to the Adjustment Team hearing and the punishment allotted Cavey. For these reason, as to both Moore and Levine, the plaintiff has failed to state a claim under 42 U.S.C. § 1983 and their motions for summary judgment will be granted. *Barrow v. Bounds*, 498 F.2d 1397 (4th Cir. 1974); *Bursey v. Weatherford*, 528 F.2d 483 (4th Cir. 1975), *rev'd on other grounds*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). *Cf. Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

■ As to defendant Mooney, there is no evidence linking him to the decision to bring proceedings against Cavey. Mooney's report of the McMahon incident does not mention Cavey. The report itself may have been correct; it may have been erroneous, self-serving or even duplicitous. This Court makes no ruling on the factual issue of whether Mooney was on the scene with the suicidal inmate when Cavey states no one responded to the inmate's cries for help. The gravamen of the plaintiff's complaint has to do with what happened to him after he wrote his letter, and who was responsible for causing a disciplinary proceeding to be called. Defendant Mooney did not participate in those decisions and thus no constitutional claim has been made against him. His motion for summary judgment will be granted.

■ The circumstances which lead this Court to grant the motions for summary judgment of Moore, Levine and Mooney do not apply to Warden Williams. It is undisputed that he received and personally read the letter which Cavey sent to him. It is a fact that as a result of reading that letter he told his subordinates to bring disciplinary action against Cavey which was to include a charge of giving false information "& what other violations of rules and regulations". As a direct result of the Warden's order, Lt. Vernon and Major Brown drew up charges against Cavey and submitted them *with the Warden's comments* to the Adjustment Team. With Williams' imprimatur, the Adjustment Team raised no question about the propriety of the charges, found Cavey guilty and punished him. Williams' participation was direct, knowing, personal and persuasive. The inescapable conclusion to be drawn from Williams' directive to Brown is that Williams thought Cavey should be punished for writing the letter, a motive which—as discussed below—is an improper one and violative of Cavey's constitutional rights. Williams' assertion of lack of personal participation in this case is without merit, because the Court finds an "affirmative link between the occurrence of . . . misconduct" (punishing Cavey for writing the letter) and the adoption of a policy showing "authorization or approval of such misconduct". *Rizzo v. Goode, supra*, at 371, 96 S.Ct. at 604.

### B. Constitutional Claims

■ When Warden Williams reacted to Cavey's letter by deliberately ordering the institution of disciplinary proceedings against him, he brought into play a form of censorship calculated to restrain Cavey from any further attempts to communicate his version of the McMahon suicide incident to either the deceased's family or the outside press. In so doing, Williams utilized prison regulations in a manner violative of the plaintiff's first amendment rights and those of outsiders with whom he would have corresponded. The addressee as well as the sender "derives from the First and Fourteenth Amendments a protection against unjustified governmental interference with the intended communication". *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). In *Martinez* the Supreme Court considered prison regulations which had been used to block transmission of a letter from an inmate to an individual outside the institution. After conceding the federal courts had generally adopted a "hands-off" policy towards reviewing the actions of prison administrators responsible for the internal order and discipline of institutions and the rehabilitation of prisoners, the Court stated that nonetheless:

> a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison . . . practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.

*Id.,* at 405–406, 94 S.Ct. at 1807. The Court then outlined the governmental interests at issue in a prison context. These are "the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners." The Court then set out the standards for censorship of prisoner mail:

> First, the regulation or practice in question must further an important or substantial governmental interest *unrelated*

to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. *Id.,* at 412–413, 94 S.Ct. at 1811. [Emphasis added.]

In *Procunier v. Martinez* the Court found unacceptable prison officials' contentions that statements that "magnify grievances" or "unduly complain" should be censored "as a precaution against flash riots and in the furtherance of inmate rehabilitation" because the Court found no proof for either proposition. Justice Marshall, concurring in the Court's opinion, urged that it move to an affirmative recognition that a "prisoner does not shed . . . basic First Amendment rights at the prison gate". *Id.,* at 422, 94 S.Ct. at 1816. The Supreme Court evidenced such recognition in its second major opinion on the subject in *Pell v. Procunier,* 417 U.S. 817, at 824, 94 S.Ct. 2800, at 2805, 41 L.Ed.2d 495 (1974), where, the Court stated that prisoners have a "liberty" interest in corresponding with the outside world and that they were entitled to:

> an open and substantially unimpeded channel for communication with persons outside the prison including representatives of the news media.

In deciding that the communication need not include live press conferences, the Court placed heavy reliance upon the prisoners' full access to the media through the mails. While incarceration may include "the necessary withdrawal or limitation of many privileges and rights", the Supreme Court held that:

> a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate

penological objectives of the corrections system. Thus challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Pell v. Procunier, supra,* at 822, 94 S.Ct. at 2804.

Each of the federal circuit courts to interpret the Supreme Court's teachings in *Martinez* and *Pell* has found that prisoners do not shed their First Amendment rights to free expression when entering penal institutions. *See, e. g. Navarette v. Enomoto,* 536 F.2d 277 (9th Cir. 1976); *Nickens v. White,* 536 F.2d 802 (8th Cir. 1976); *Aikens v. Jenkins,* 534 F.2d 751 (7th Cir. 1976). The courts have stated that the first amendment right of prisoners to hold and express beliefs deserves "special solicitude", *Morgan v. LaVallee,* 526 F.2d 221 (2d Cir. 1975) and that letter mail is a "vital means of communication in our society", *United States v. Ramsey,* 176 U.S.App.D.C. 67, 538 F.2d 415, 420 (1976), *cert. granted,* 429 U.S. 815, 97 S.Ct. 56, 50 L.Ed.2d 75 (1976).

The Fourth Circuit, in *Timmerman v. Brown,* 528 F.2d 811, 812 & 815 (4th Cir. 1975), found that prisoners had a cause of action under the civil rights statute when they showed that the defendants:

conspired to deprive plaintiffs of their right . . . to speak and write about the wrongs perpetrated upon them . . .
We have no doubt that plaintiffs, even though they are inmates, have some first and fourteenth amendment rights to air their grievances . . . .

The stifling of expression of prisoner's beliefs was also decried by the Third Circuit in *Main Road v. Aytch,* 522 F.2d 1080 (3rd Cir. 1975). The Court held that the power of the superintendent of the penal institution, without benefit of administrative directives, to decide that certain topics were "explosive", "sensitive" or affected the "climate of the institution" constituted an unacceptable and uncontrolled latitude about what ideas and feelings could be expressed by the plaintiff-inmate and violated his constitutional rights. Such action violated basic constitutional principles:

A fundamental purpose of the First Amendment is to foreclose governmental control or manipulation of the sentiments uttered to the public. With only carefully calibrated exceptions, [obscenity and "clear and present danger"] "the First Amendment means that government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content."

. . . In particular, state or local as well as federal officials, including prison administrators, may not prevent persons from publicizing their views in order to prevent criticism of other government agencies.

*Main Road v. Aytch, supra,* at 1088–89. [Footnotes omitted.]

The Fifth Circuit, in *Taylor v. Sterrett,* 532 F.2d 462 (5th Cir. 1976) considered the question of censorship of prisoners' communications by mail with the press, and specifically *indirect* forms of censorship. Finding that written correspondence is a principal method available to prisoners to communicate with private and public individuals or entities, the Court held that jail practices which inhibited that medium seriously impaired the prisoner's communicative capability and constituted an abridgement of his constitutional rights.

Similarly the federal district courts have uniformly applied the two-part test enunciated in *Martinez,* requiring both a serious and legitimate prison concern (internal order and discipline, security, rehabilitation) and a tailoring of restrictions to those no broader than that which is essential to protect the governmental interest. In those few cases in which the prison authorities have found court approval for their actions, the circumstances justifying the censorship are clear. Prisons seeking to protect inmates being sent from one institution to another for their well-being have been permitted to screen letters from other inmates in the old institution to those in the new,

lest the placing of the inmate-at-risk in the new prison be jeopardized. *Peterson v. Davis*, 415 F.Supp. 198 (E.D.Va.1976); *Williams v. Ward*, 404 F.Supp. 170 (S.D.N.Y. 1975). Occasionally there are situations which pose demonstrated clear and immediate danger of disorder and violence, *Mims v. Shapp*, 399 F.Supp. 818 (W.D.Pa.1975) or prisoners' use of the mails to abuse and threaten former victims. *White v. Woodroff*, 378 F.Supp. 1004 (W.D.Va.1974). In the majority of cases, the courts have ruled unconstitutional the attempts of prison authorities to prevent inmates from communicating their grievances, their ideas and their concerns to the outside world, whether it be by informal censorship of "inflammatory" material, *Brown v. Schubert*, 389 F.Supp. 281 (E.D.Wis.1975); *Chiarello v. Bohlinger*, 391 F.Supp. 1153 (S.D.N.Y.1975), or by prison regulation, *Hopkins v. Collins*, 411 F.Supp. 831 (D.Md.1976); *Burke v. Levi*, 391 F.Supp. 186 (E.D.Va.1975); *Frazier v. Donelon*, 381 F.Supp. 911 (E.D.La. 1974).

In none of the cases cited was there as flagrant and harsh censorship as occurred in the treatment of the plaintiff in this case. Cavey was punished for daring to write to the chief administrator of the institution in which he was incarcerated telling the Warden of an incident which, if true, could only be of great concern to the Warden and others both within and without the prison. Cavey's "threat" was that he would exercise his own First Amendment right to voice his feelings and communicate to the outside world. Those to whom he said he would write had First Amendment interests at stake in receiving his communication, however erroneous. *Procunier v. Martinez*, *supra*. In response, Williams moved swiftly and effectively to silence Cavey with punishment.

█ Defendant Williams has submitted no documentation in his motion for summary judgment or otherwise during the course of this action to merit any finding that the security or discipline of the institution was actually threatened in any way by Cavey's writings, or that any legitimate purposes of

rehabilitation were served by muffling Cavey's criticism. The only document before the Court is the letter of Lieutenant Vernon, excerpted previously, in which the "threat" Cavey posed was obviously that: "bad publicity for the institution" might result if the letter reached outsiders. (The conclusion that "perhaps" inmate unrest would result is too highly speculative to be sufficient under the Supreme Court's standards in *Martinez*.) No attempts were made to exercise the least restrictive means of handling Cavey's criticisms. Although Cavey had no right to demand that his letter be printed in the prison newsletter or that the prison authorities make arrangements for its publication in local outside newspapers, he had the right to send his letter to the outside world unimpeded.

█ There is no doubt but that the action of the Warden was intentional, not negligent. *Cf., Carder v. Steiner*, 225 Md. 271, 170 A.2d 220 (1961). Having made a "[positive] showing of ill will, improper motivation or evil purpose" on the part of the Warden, Cavey has made a sufficient showing of "malice" under Maryland tort law to entitle him to damages. *Brewer v. Mele*, 267 Md. 437, 298 A.2d 156 (1972). Williams is not entitled to raise the defense of immunity because the matter before the Court is not whether he exercised his discretion within the confines of established prisoner adjustment procedures, *Fitchette v. Collins*, 402 F.Supp. 147 (D.Md.1975), but rather whether he utilized those procedures for a wholly improper purpose—to prevent Cavey from disseminating information to the outside world about the suicide incident and the condition of the observation cells used for suicidal inmates. Therefore, the defendant Williams has made no showing sufficient to meet the burden of proof for a good faith affirmative defense. *Pritchard v. Perry*, 508 F.2d 423 (4th Cir. 1975). *Cf. Wood v. Strickland*, 420 U.S. 308, 321–22, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

## C. Damages

█ The plaintiff has requested that the Court make an appropriate determination

of the damages to which he is entitled in the event of a ruling be in his favor. Having found deliberate action on the part of Warden Williams knowingly calculated to deprive the plaintiff of his first amendment rights, the Court finds that the plaintiff is entitled to recover from Williams money damages equalling the amount of wages lost by Cavey in his institutional job while he was on segregation and the amount of $5.00 per day for 15 days, or $75.00, in punitive damages. The plaintiff and the institution will provide the Court with information about of sum of wages lost.

Having considered the cross motion for summary judgment filed in this case, it is this 24th day of May, 1977, by the United States District Court for the District of Maryland, ORDERED:

1. That the motions for summary judgment of defendants Levine, Moore and Mooney be and the same are, hereby GRANTED;

2. That the motion of the plaintiff for summary judgment against the defendant Ralph Williams be, and the same is, hereby GRANTED; and

3. That the defendant Ralph Williams is ordered to pay to the plaintiff the sum of $75.00 in punitive damages and, in addition, compensatory damages representing wages lost by the plaintiff from his institution job during period of segregated confinement.