UNITED STATES of America, Plaintiff-Appellee,

v.

Nina Helene FOGELMAN, Mark Knight Odiorne, Peter Michael Davis, Harold E. Olson and Eldon Thompson, Defendants-Appellants.

No. 75–4048.

United States Court of Appeals, Fifth Circuit.

Oct. 11, 1978.

Brown, Chief Judge, filed a concurring opinion.

Godbold, Circuit Judge, filed a dissenting opinion.

Mehrtens, District Judge, filed an opinion dissenting in part.

Alex L. Zipperer, III, W. Lance Smith, Savannah, Ga., for Fogelman & Odiorne.

Joseph B. Bergen, Savannah, Ga., for Davis.

Frank R. Madera, Greenvale, N. Y., for Olson.

Thomas R. Taggart, Frederick Kramer, III, Savannah, Ga., for Thompson.

William T. Moore, Jr., U. S. Atty., Augusta, Ga., Lamar C. Walter, Asst. U. S. Atty., S. D. Ga., Savannah, Ga., for plaintiff-appellee.

Before BROWN, Chief Judge, GOD-BOLD, Circuit Judge, and MEHRTENS *, District Judge.

MEHRTENS, District Judge.

Harold E. Olson, Peter Michael Davis and Eldon Thompson appeal from a conviction by a jury of importing, conspiracy to import, possessing with intent to distribute, and conspiracy to possess with intent to distribute marihuana, in violation of 21 U.S.C., §§ 952, 960, 812 and 18 U.S.C. § 2. We affirm those convictions.

Since the Court is not unanimous in its disposition, the opinion is constructed in subparts to indicate our action more clearly. All are in agreement in Part I. The Chief Judge and Judge Godbold are in agreement with Part II as to which Judge Mehrtens files a dissent. The Chief Judge and Judge Mehrtens joins in Part III, to which Judge Godbold files a dissent.[1]

### I

In preparation for later importation of marihuana, Olson and Odiorne came to the Savannah, Georgia area, seeking to buy waterfront property which would accommodate a boat approximately 42 feet in length. On February 24, 1975, Olson agreed to purchase land on Schley Avenue, fronting on deep water. On March 13, 1975, Olson signed a sales contract for the purchase of a 30-acre farm in Georgia, allegedly for the purpose of storing excess marihuana. Later Davis picked up the keys to the farm property. In mid-March a neighbor who lived next door to the Schley Avenue property met Olson and Davis. Olson introduced Davis as his partner.

On April 13, 1975, Odiorne, Fogelman and Cuschieri brought a boatload of marihuana to the Schley Avenue property in the boat "ODESSA" owned by Davis. The marihuana was taken from the boat and loaded on two pickup trucks by Odiorne, Fogelman, Cuschieri, Davis, Olson, Eldon Thompson, his brother Denver Thompson, and a government informant. After it was loaded, it was transported to Atlanta by Olson, Davis, the Thompsons and the informant.

A few months later, on June 18, 1975, Georgia narcotics agent James T. Hallman met Denver and Eldon Thompson at the Schley Avenue property. Denver stated that his boss owned the property at Schley Avenue and that they were waiting for him.

Because of information obtained through its investigation, the Government believed that the ODESSA would again be coming into the United States with an illegal cargo. Based on multiple charts and the ODESSA's log book found later, the Government was able to show that beginning on June 6, 1975, the ODESSA had traveled from off the coast of Curacao, Netherlands Antilles to Columbia, South America and back through the Caribbean area to the Georgia coast.

On June 20, 1975, at 1:00 P.M. the ODESSA docked at the boat house at Schley Avenue. Three persons were on board: Fogelman, Cuschieri and Odiorne. The informant observed that the entire bottom of the boat was completely full of marijuana and reported this to the federal agents. That day, between 9:00 and 11:00 P.M., the marijuana was taken from the boat by the Thompsons, Odiorne, Fogelman, and the informant, and loaded on to four trucks. The trucks were then driven to the Days Inn Motel in Savannah. Early in the morning of June 21, 1975, two of the trucks were driven from the Days Inn Motel in Savannah to the Motel One in Atlanta, Georgia by the Thompsons.

Government agents observed the unloading of the ODESSA and the loading of the

---

* Senior District Judge of the Southern District of Florida, sitting by designation.

1. For historical precedent for this appellate opinion procedure, see *United States v. Regis-ter*, 5 Cir., 1974, 496 F.2d 1072; *Stanga v. McCormick Shipping Corp.*, 5 Cir., 1959, 268 F.2d 544. Cf. *Grigsby v. Coastal Marine Serv. of Texas, Inc.*, 5 Cir., 1969, 412 F.2d 1011, 1023.

trucks. This surveillance and the informant's reports provided the government, beyond any doubt, with reasonable cause to suspect that the trucks were loaded with marijuana from the ship. And from the loading at Schley Avenue on, through to the Days Inn in Savannah and finally to the Motel One in Atlanta, the trucks were kept under constant observation by various government agents.

At 1:00 A.M. on the twenty-first, agents of Customs, the Drug Enforcement Administration and the State of Georgia boarded the ODESSA and placed Cuschieri under arrest. Customs agents observed marijuana residue all over the vessel, and seized the boat. Cuschieri stated the agents had just missed $5,000,000 worth of "grass."

At 2:00 A.M. an agent examined the contents of the two other trucks not driven by the Thompsons at the Days Inn in Savannah and found bales of marihuana.

At 5:30 P.M. the informant received a call from Olson which was recorded with the informant's consent. Olson indicated surprise that the boat was early. He was then arrested in his hotel room. After obtaining Olson's consent, the arresting officers opened his briefcase, finding money and other documents of evidentiary value.

At 8:30 P.M. as the Thompsons left the Motel One in Atlanta, they turned and waved at one of the surveillance agents. Because of this believed-to-be gesture of recognition, the Customs, state and federal personnel who had followed the two trucks to Atlanta in an attempt to discover where the marijuana would be delivered proceeded to arrest the Thompsons. By the time of the arrest of Eldon and Denver Thompson, the Customs agents had learned of the seizure of the other trucks which revealed marijuana. With this information, a Customs agent seized and opened the two trucks in Atlanta and verified that they contained marijuana.

All the defendants were found guilty on all four counts of the indictment. Olson, Davis and Eldon Thompson appealed.

■ Olson's primary allegation of error is that his constitutional rights were violated by the admission into evidence of portions of the recorded conversation between himself and the government's confidential informant.

A motion for discovery was filed by Olson's attorney, seeking, among other evidence, the inspection and production of any written or recorded statements or confessions of Olson.

At a hearing the United States Attorney stated to the court that there were some incriminating statements (meaning the tape) that he would use at trial, that had not been produced. The judge stated that Olson's attorney was entitled to see them and that they should be delivered to the judge for inspection in camera. The United States Attorney replied that he had no objection. No formal order, however, requiring delivery of the tape is in the record.

The trial extended from Wednesday, September 10, to Thursday, September 18, 1975. On the first day of the trial, the court asked the government to give the defense a list of witnesses it intended to call. The United States Attorney did so and included the name of the informant, stating that he would testify and that the government had a tape of his conversation with Olson.

One of the defense attorneys then asked the court to instruct the United States Attorney to deliver a copy of the statement and tape of the informant he had just included in the witness list. It is unclear when the defense first learned of the existence of the tape. It is clear, however, that up until that point the government had not complied with the motion for discovery and had not produced it.

On the second day of trial, the court directed the government to allow the defense to listen to the tape.

On Friday, the next day, in chambers, the United States Attorney admitted he had withheld the tape and the identity of the informant because of a threat on the life of the informant, who had been placed in pro-

tective custody. The tape was suppressed by the court for use in the case in chief.

During his direct examination, Olson imparted a definite impression that his relationship with the informant was of a superficial nature, wholly unrelated to any marihuana. To contradict this, the court admitted an edited transcript of the tape for impeachment purposes only. Through editing, all references to the other defendants were excluded.

Such impeachment evidence was properly admitted. Even if there was no disclosure of the Olson tape as required by Rule 16 of the Federal Rules of Criminal Procedure, any error was corrected by the trial judge's ruling that the contents of the tape would not be admissible in the government's case in chief.

The language of Judge Ingraham in *United States v. James*, 5 Cir., 1974, 495 F.2d 434, 436, a case in which the United States Attorney failed to produce a tape recording under a discovery order, is significant in the present case:

"Our distaste for the government's conduct does not, however, warrant a reversal of the case at bar. We have previously held that 'an error in administering the discovery rules is not reversible absent a showing that the error was prejudicial to the substantial rights of the defendant.' *United States v. Saitta*, 443 F.2d 830, 831 (5th Cir., 1971), cert. den., 404 U.S. 938, 92 S.Ct. 269, 30 L.Ed.2d 250; *United States v. DeSimone*, 452 F.2d 554, 557 (5th Cir., 1971); *accord United States v. Dowdy*, 455 F.2d 1253, 1255 (10th Cir., 1972); *United States v. Cole*, 453 F.2d 902, 904 (8th Cir., 1972); *United States v. Allsenberrie*, 424 F.2d 1209, 1215 (7th Cir., 1970). *See also Pierce v. United States*, 414 F.2d 163, 169 (5th Cir., 1969), cert. den., 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425. A thorough review of the record in this case leaves us convinced that the prejudice, if any, flowing from the government's failure to produce the tapes until the time of trial was insubstantial."

The tape contained nothing exculpatory, but the remarks were relevant, incriminating, and impeached the testimony given by Olson on direct examination. At the trial Olson identified the conversation as one which he had with the informant. Each of the other defendants had the opportunity to cross-examine Olson on the contents of the admitted conversation. Further, the informant was available for cross-examination regarding the tape; yet none of the defendants elected to do so.

In *Harris v. New York*, 1971, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1, the Supreme Court noted that it does not follow from *Miranda v. Arizona*, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided that the trustworthiness of the evidence satisfies legal standards.

"The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements."

401 U.S. at 226, 91 S.Ct. at 646.

Olson also contends that the search and seizure of his briefcase in his hotel room upon arrest was unreasonable and in violation of his Fourth Amendment rights.

█ After the agents identified themselves and stated that Olson was under arrest, one of the agents asked Olson if he had any valuables or large sums of money that could present problems later, if seized by them. Olson replied that he had a large amount of money in his briefcase, and said he did not have any objections to the agent searching the case and verifying the amount. Money and documentary evidence were found.

After weighing conflicting evidence, the District Court found that this search was done by consent. The appellant has not demonstrated that this fact finding was plainly erroneous. *United States v. Resnick*, 5 Cir., 1972, 455 F.2d 1127, 1133.

Defendant Davis asserts that the trial court erred in failing to grant his motion for severance. Davis was charged with the same offenses as the other defendants. It is within the sound discretion of the trial judge as to whether the defendants should be tried together or severally, and there is nothing in the record to indicate an abuse of such discretion when Davis' motion for severance was overruled. *Opper v. United States*, 1954, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101. *See also Peterson v. United States*, 5 Cir., 1965, 344 F.2d 419; *West v. United States*, 5 Cir., 1962, 311 F.2d 69; *Davis v. United States*, 5 Cir., 1945, 148 F.2d 203, *cert. denied*, 1945, 325 U.S. 888, 65 S.Ct. 1570, 89 L.Ed. 2001.

## II *

Eldon Thompson is the only defendant in this action with standing to challenge the seizure and search of the parked trucks, one of which he had driven to the Motel One in Atlanta.

The government argues that the search was based on probable cause and that exigent circumstances justified the warrantless intrusion.

### Probable Cause

After being under surveillance all day at the motel, the Thompsons while walking to an adjacent shopping center waved to one of the surveying agents. The agents, believing that this indicated recognition, arrested the men. One of the agents then walked over to the trucks, took the key out of the ignition, and opened the locked truck body. He instructed another agent to do the same with the other truck. It was then determined that the bales which the government agents had previously watched being taken from the ODESSA and placed into these trucks contained marijuana. Each truck contained at least 1,500 pounds of this erstwhile weed.

Based on the record in this case, ample probable cause existed. Consequently, our attention must focus on whether a warrant was unnecessary under either the exigent circumstances exception or the extended border search rationale.

### Exigent Circumstances

For exigency purposes, this Court's decision in *United States v. Mitchell*, 5 Cir., 1976, 538 F.2d 1230 (en banc) represents the outermost limits to which this Circuit has gone in searches like this one. Many of the facts are common to both cases—surveillance of the vehicles from border to a motel parking lot; operators of the vehicles checked into the motel; surveyance was continued because the agents were waiting for future developments. In both cases there were numerous agents.

*Mitchell* recognized that there is no general automobile exception to Fourth Amendment requirements. The movable nature of an automobile is not enough. There must be exigent circumstances as well. 538 F.2d at 1233–34.

The exigency in *Mitchell* arose from the following facts. The truck had been driven from the border to the motel at San Antonio by Mancuso, whose instructions were to leave it parked in the parking lot of the particular motel. He parked it, locked it, disposed of his keys and left. Thereafter, Mitchell appeared in a rented automobile, parked alongside the truck, unlocked it, and transferred his dog and gear from the car to the truck. He relocked the truck and left. About a half an hour later he returned in a taxi, re-entered the truck cab and seated himself. "It appeared imminent that he was going to drive the truck away." *Id.* at 1232. Customs agents converged on the truck and arrested him.

Plainly, a seizure was not only authorized, but mandated. The delivery had been made and the recipient was about to leave with the truck and the marihuana. Such exigency did not exist in the case at hand. With numerous officers around the premises and the two drivers in custody, there was no threat that the trucks were likely to be moved or their contents lost.

* The Chief Judge and Judge Godbold concur in Part II. Judge Mehrtens dissents.

The Supreme Court in *Chambers v. Maroney*, 1969, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419, stated:

"Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search. *Carroll [Carroll v. United States*, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543] holds a search warrant unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible."

399 U.S. at 51, 90 S.Ct. at 1981.

This Circuit has recognized that *Chambers* is limited to highway stops. *See United States v. Chapman*, 5 Cir., 1973, 474 F.2d 300; *United States v. Ragsdale*, 5 Cir., 1972, 470 F.2d 24.

The Court finds that the warrantless search and seizure of Thompson's truck in the motel parking lot, without exigent circumstances, were violative of his Fourth Amendment rights unless otherwise valid as an extended border search and seizure.

### III *

### *Extended Border Search*

To escape the consequences of the Court's holding the government argues that the warrantless search of the trucks was justified as a border search despite the substantial distance between Savannah and Atlanta.

It is true that the trucks had not crossed a border, but this Circuit has decided that a border crossing is not the *sine qua non* of a valid border search. *United States v. Steinkoenig*, 5 Cir., 1973, 487 F.2d 225; *United States v. Hill*, 5 Cir., 1970, 430 F.2d 129. This, however, does not grant freewheeling discretion for determining the cutoff between a border search and a non-border search. In all instances where a search has been called a border search, a reasonable suspicion that the vehicle had crossed the

border or had been in contact with those who have done so has been and is required. *United States v. Woodard*, 5 Cir., 1976, 531 F.2d 741; *United States v. Storm*, 5 Cir., 1973, 480 F.2d 701.

This is not a case where a motor vehicle has crossed the border. Rather, it is a vessel coming from international waters and unloading in view of the government agents who watched the entire operation. The border in this instance is the dock where the ODESSA was unloaded just as it would be in the arrival of an ordinary merchant vessel.

■ The legality as a "border search" not made in the vicinity of the border is tested by the totality of the surrounding circumstances, including the elapsed time and distance as well as the manner and extent of surveyance. These factors must be such as to convince the fact-finder with reasonable certainty that there has been no change of condition of the trucks from the time they were loaded at the border until they were stopped, and that whatever was in the trucks when they were searched was in them when they left the border. *See United States v. Brom*, 5 Cir., 1976, 542 F.2d 281; *United States v. Flores*, 5 Cir., 1976, 531 F.2d 222.

The facts of this case are strikingly parallel to those of *United States v. Martinez*, 5 Cir., 1973, 481 F.2d 214, *reh. den.* 481 F.2d 1404 (5 Cir.), *cert. den.* 1974, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 489, in which this Court upheld a similar warrantless extended border search.

*Martinez* involved the search and seizure of marihuana from a truck which had entered the United States from Mexico. Agents followed the truck 300 miles throughout South Texas, for a period of 142 hours, until they stopped it in San Antonio, 150 miles from the border. The truck had been constantly surveilled, except for 35 minutes, and the agents had reasonable suspicion to believe it contained contraband. It was searched without a warrant and 628 pounds of marihuana were found.

* The Chief Judge and Judge Mehrtens concur in Part III. Judge Godbold dissents.

The Court did not find this to be a violation of the defendant's Fourth Amendment rights, pointing out that border searches, absent search warrants or probable cause, have been uniformly upheld by the courts as long as the Customs agents have had a reasonable suspicion of violations of the Customs laws. 481 F.2d at 217.

> "Although proximity to the border and the lapse of time since the crossing are proper factors for consideration, no specific temporal or spatial limitations on the authority to conduct a border search have been imposed either by statute or by judicial decisions. Thus to reiterate, the appropriate constitutional test is a reasonableness standard, which requires a full evaluation of the circumstances leading to the search as a basis for determining its propriety."

*Id.* at 217–18.

This standard in the border search context is less rigorous than the probable cause requirement which normally obtains under the Fourth Amendment. *Id.* at 218 n.7; *United States v. Garcia*, 5 Cir., 1971, 452 F.2d 419, 421.

As the Court indicates, the wisdom of the concept of an "elastic" border is illustrated by the circumstances of *Martinez.*

> "In order to enforce the customs laws, particularly those dealing with the illegal importation of drugs, law enforcement officials must do more than arrest the street level operative; they must, if at all possible, apprehend the ringleaders as well. This objective would not be easily attainable if the authority of customs agents to search was strictly limited to the physical border. *By following the truck inland the customs agents obviously hoped to apprehend others involved in the smuggling of a large quantity of marijuana.* In view of their purpose we think they used a legitimate law enforcement technique which did not undermine their authority."

481 F.2d at 218. (Emphasis added).

The court also found the time and distance of the search from the border to be reasonable under the circumstances, and refused to formulate a *per se* rule.

■ Similarly, the Customs agents in the instant case had probable cause to believe Thompson's truck was carrying contraband. They had seen him unload the ODESSA and load his truck with the marihuana. They had surveilled him constantly from Savannah, where he loaded the truck, until he was arrested 20 hours later in Atlanta—approximately 254 miles away. The time factor here was far less than the 142 hours in *Martinez*, and there was no 35-minute gap in surveillance, as there was in that case. Customs agents were involved in every important stage of the operation—observing the loading of the truck, surveilling, making the arrest, and searching the truck. Any pretext or bad faith on the party of local officers in having the Customs agents participate as a "portable search warrant" has not been shown.

It was the Customs agents who were acknowledged by the Thompsons when they waved at the surveillance car in the parking lot. At that point prudent police work dictated that they be arrested, as knowledge that they were being followed could have resulted in loss of them or of the evidence.

The most significant similarity between the two cases is the use of the legitimate police tactic of following the trucks to an unknown destination where the contraband is to be ultimately distributed. This public policy was recognized as valid in *Martinez* and we uphold its validity under the facts presented here.

Although *Martinez* was distinguished by the panel opinion in *United States v. Mitchell*, 5 Cir., 1976, 525 F.2d 1275, because there the government agents had (i) a detailed and reliable itinerary, (ii) knew the destination of the vehicle, and (iii) were prepared to search the vehicle at its known destination, that simply is not the case here. In both *Martinez* and this case, the journey was to an unknown destination. We need not expend great effort in further attempts to distinguish any tarnish that the *Mitchell* panel opinion may have placed on the *Martinez* continuous surveyance rationale be-

cause this Court subsequently in its en banc *Mitchell* opinion, 538 F.2d 1230, 1234 n.4, vacated that portion of the *Mitchell* panel's opinion discussing this facet of *Martinez.* Thus, *Martinez* remains the law of this Circuit for continuance surveyance-border search situations of the sort presented in this case.

Neither is *United States v. Brennan,* 5 Cir., 1976, 538 F.2d 711, of any help to Thompson because the facts and circumstances are crucially different in that case. In holding that a warrantless search of an airplane at Melbourne, Florida Regional Airport was not a valid border search because made without probable cause or a warrant, the court pointed out that international flights were only a small percentage of the traffic and there was no differentiation by officials between international and domestic flights, finding that the assumed international origin was too attenuated and that the search more closely resembled a common non-border search which must be prefaced by the usual probable cause and warrants standards.

Considering the totality of the surrounding circumstances, including the time and distance elapsed as well as the manner and extent of surveillance, and the total absence of any evidence indicating any likelihood that the marijuana had been unloaded in the interim, we are convinced that the officers could conclude that any contraband found in the truck at the time of search was in the truck from the time it was loaded with marijuana from the ODESSA at the port of entry. Consequently, both the search and the seizure were reasonable and hence lawful.

AFFIRMED.

JOHN R. BROWN, Chief Judge, concurring:

I concur in all portions of the Court's opinion. However, I wish to expand the basis of my concurrence in Part III. In that portion of the opinion, emphasis is placed on *United States v. Martinez,* 5 Cir., 1973, 481 F.2d 214, *cert. denied,* 1974, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 489, which has not been overruled. I do not rest my agreement with Part III's extended border search holding simply on the unreversed status of *Martinez.* Because the ODESSA, the trucks and their cargo were subject to a warrantless Customs search, to seizure for forfeiture and to secure penalties, and as evidence under the respective Customs statutes,[1] the entire concept is that constant surveillance from the border to the point of

---

1. Some of the more directly applicable are 19 U.S.C.A. §§ 482, 1581, 1582, 1594, 1595a and 18 U.S.C.A. § 545.

19 U.S.C.A. § 482:

Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in,

or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial.

19 U.S.C.A. § 1581:

(a) Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under sections 1701 and 1703–1711 of this title, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

(b) Officers of the Department of the Treasury and other persons authorized by such department may go on board of any vessel at any place in the United States or within the customs waters and hail, stop, and board such vessel in the enforcement of the navigation laws and arrest or, in case of escape or attempted escape, pursue and arrest any per-

ultimate seizure, though removed by time and distance from the border, maintained the truck's status as subject to a warrantless Customs seizure and search.[2]

son engaged in the breach or violation of the navigation laws.

\*　　\*　　\*　　\*　　\*　　\*

(e) If upon the examination of any vessel or vehicle it shall appear that a breach of the laws of the United States is being or has been committed so as to render such vessel or vehicle, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel or vehicle, liable to forfeiture or to secure any fine or penalty, the same shall be seized and any person who has engaged in such breach shall be arrested.

(f) It shall be the duty of the several officers of the customs to seize and secure any vessel, vehicle, or merchandise which shall become liable to seizure, and to arrest any person who shall become liable to arrest, by virtue of any law respecting the revenue, as well without as within their respective districts, and to use all necessary force to seize or arrest the same.

(g) Any vessel, within or without the customs waters, from which any merchandise is being, or has been, unlawfully introduced into the United States by means of any boat belonging to, or owned, controlled, or managed in common with, said vessel, shall be deemed to be employed within the United States and, as such, subject to the provisions of this section.

(h) The provisions of this section shall not be construed to authorize or require any officer of the United States to enforce any law of the United States upon the high seas upon a foreign vessel in contravention of any treaty with a foreign government enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon said vessel upon the high seas the laws of the United States except as such authorities are or may otherwise be enabled or permitted under special arrangement with such foreign government.

19 U.S.C.A. § 1582:

The Secretary of the Treasury may prescribe regulations for the search of persons and baggage and he is authorized to employ female inspectors for the examination and search of persons of their own sex; and all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations.

19 U.S.C.A. § 1594:

Whenever a vessel or vehicle, or the owner or master, conductor, driver, or other person in charge thereof, has become subject to a penalty for violation of the customs-revenue laws of the United States, such vessel or vehicle shall be held for the payment of such penalty and may be seized and proceeded against summarily by libel to recover the same: *Provided*, That no vessel or vehicle used by any person as a common carrier in the transaction of business as such common carrier shall be so held or subject to seizure or forfeiture under the customs laws, unless it shall appear that the owner or master of such vessel or the conductor, driver, or other person in charge of such vehicle was at the time of the alleged illegal act a consenting party or privy thereto.

19 U.S.C.A. § 1595a:

(a) Except as specified in the proviso to section 1594 of this title, every vessel, vehicle, animal, aircraft, or other thing used in, to aid in, or to facilitate, by obtaining information or in any other way, the importation, bringing in, unlading, landing, removal, concealing, harboring, or subsequent transportation of any article which is being or has been introduced, or attempted to be introduced, into the United States contrary to law, whether upon such vessel, vehicle, animal, aircraft, or other thing or otherwise, shall be seized and forfeited together with its tackle, apparel, furniture, harness, or equipment.

18 U.S.C.A. § 545:

Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or

Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law——

Shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Proof of defendant's possession of such goods, unless explained to the satisfaction of the jury, shall be deemed evidence sufficient to authorize conviction for violation of this section.

Merchandise introduced into the United States in violation of this section, or the value thereof, to be recovered from any person described in the first or second paragraph of this section, shall be forfeited to the United States.

\*　　\*　　\*　　\*　　\*　　\*

2. The constant surveillance procedure has been utilized to preserve the extended border search

Examination of the record reveals the absolutely constant surveillance of the trucks and marijuana in question. Prior to the arrival of the ODESSA on June 20, 1975, government agents had received information from a confidential and reliable informant that the ODESSA was bringing a cargo of marijuana into the United States from Colombia, South America. Subsequently, through the use of some papers which constituted the ODESSA's log book and nautical charts taken from the ODESSA, the voyage of the ODESSA from South America to her docking at Coffee Bluff a few miles south of Savannah was later retraced in greater detail. On June 20, 1975, somewhere off the Georgia Coast as she progressed northward in the intracoastal waterway, the ODESSA was spotted from a Customs' aircraft by Customs' personnel who had been on the lookout for her. The ODESSA was placed under surveillance until she docked at Coffee Bluff. That night, Customs and other agents stationed themselves 200 to 300 feet from the ODESSA and began their constant land-based surveillance. Through the use of a "Starlight" scope, they watched as packages resembling those ordinarily used in transporting marijuana were off-loaded from the ODESSA and placed into four trucks which left with the contraband. The constant surveillance was continued to the Days Inn in Savannah, Georgia. Shortly before the search of the ODESSA and the two trucks remaining at the Days Inn, the other two trucks proceeded on to Atlanta with several government cars falling in line with them and a surveillance plane circling overhead. At all times from the unloading of the ODESSA until their seizure in the Motel One parking lot in Atlanta these two trucks containing the marijuana which Eldon Thompson seeks to have excluded from evidence were under the constant surveillance of the law enforcement agents participating in this in-

vestigation. At the time of the arrest of the Thompsons and the seizure and opening of the trucks which resulted in the seizure of their marijuana cargo, no person other than those already known to have been active participants in this illegal importing scheme were drawn into or implicated in the scheme by the constant surveillance of these vehicles.

### Border Customs

Under the Customs statutes, Customs agents are granted significant powers to board, search and seize vessels or vehicles that have or are about to enter into the United States from areas outside its boundaries. One basis of such authority is 19 U.S.C.A. § 1581(a) which grants officers of the Customs authority to

at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under sections 1701 and 1703–1711 of this title, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

This Court has interpreted this statutory provision as permitting Customs boardings and searches of certain vessels without warrant, probable cause or any degree of suspicion. *United States v. Williams*, 5 Cir., 1977, 544 F.2d 807, 811; *cf. United States v. Ivey*, 5 Cir., 1977, 546 F.2d 139, 144. One of those classes of vessels that Customs officers are entitled to search are newly arrived

status of a search or seizure, but generally in instances with somewhat more limited geographical distances from the border involved. See generally *United States v. Kessler*, 9 Cir., 1974, 497 F.2d 277; *United States v. Markham*, 9 Cir., 1971, 440 F.2d 1119; *United States v.*

*Weil*, 9 Cir., 1970, 432 F.2d 1320, *cert. denied*, 1971, 401 U.S. 947, 91 S.Ct. 933, 28 L.Ed.2d 230; *United States v. Alexander*, 9 Cir., 1966, 362 F.2d 379, *cert. denied*, 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439.

ones to determine whether goods requiring entry are aboard. *Williams, supra,* 544 F.2d at 810; *United States v. Ingham,* 5 Cir., 1974, 502 F.2d 1287, 1291, *cert. denied,* 1975, 421 U.S. 911, 95 S.Ct. 1566, 43 L.Ed.2d 777.

Thus at the time the ODESSA docked, the Customs agents possessed without the necessity of a warrant sufficient authority within the constraints imposed by the Fourth Amendment to board and search the ODESSA and seize it and any illegal cargo that she had brought into this country. See *Williams, supra,* 544 F.2d at 810; *Ivey, supra,* 546 F.2d at 144. Likewise, Customs agents had equal capacity to conduct a warrantless search and seizure of the trucks during the time that they were utilized in the off-loading of the ODESSA. See *United States v. Brom,* 5 Cir., 1976, 542 F.2d 281; *United States v. Flores,* 5 Cir., 1976, 531 F.2d 222, *cert. denied,* 429 U.S. 976, 97 S.Ct. 484, 50 L.Ed.2d 584; *United States v. Steinkoenig,* 5 Cir., 1973, 487 F.2d 225; *United States v. Hill,* 5 Cir., 1970, 430 F.2d 129; *United States v. Markham,* 9 Cir., 440 F.2d 1119.[3] The Customs search and seizure of the ODESSA was both appropriate and lawful. Once this point is reached with the accompanying knowledge of the unlawfully imported marijuana, the ODESSA, its cargo, and the trucks used to facilitate its transportation to the ultimate destinations were subject to seizure under the respectively applicable provisions of 19 U.S.C.A. §§ 482, 1581(e), (f), 1594, for forfeiture under 19 U.S.C.A. § 1595a and 18 U.S.C.A. § 545, to secure penalties under 18 U.S.C.A. § 545, and for use at trial under 19 U.S.C.A. § 482.

### Borders Of Border Searches

The search and seizure of the ODESSA and the trucks is not of the normal ilk for those persons who with their property are legally present in the United States. In this case, a singular context is created partly by constant surveillance and partly by the border search nature of the contested seizure and search.

From the context of the facts *in this case,* the constant surveillance procedure has ensured that none of the usual arguments for obtaining a warrant prior to the seizure of the marijuana are applicable. The use of constant surveillance of the vehicles and the Thompsons did not reveal contact with nor draw any individuals into the importing operation other than those already known to be active participants. The search and seizure had its origin in a border crossing where Customs agents watched the actual crossing and knew of the presence of the illegal cargo. It was not one where a border crossing was merely suspected. Also, the search and seizure involved vehicles in an open parking lot, not a private dwelling or similar place. Because a border crossing had taken place, Thompson knew that a Customs search and seizure could be undertaken without a warrant—at least at the dock where the ODESSA was off-loaded. The search and seizure was not one representing a fishing expedition for evidence of crime, rather, the crime was known and continuing to the point of Thompson's apprehension. More importantly, the use of constant surveillance made unnecessary any interference with legitimate traffic—those lawfully traveling within this country.

As indicated previously, the border search-Customs nature of this case allowed Customs officials to search and seize the ODESSA, its cargo, and the trucks on the dock without a warrant. Consequently, during the off-landing, Customs agents could have stopped, searched and seized the trucks without a warrant and obtained the evidence Eldon Thompson desires to have excluded. Instead, they chose to utilize constant surveillance in an attempt to catch the "higher-ups" or other cohorts.

Vis-a-vis Thompson, this is not an instance where Customs agents exercised unfettered discretion in the sense that the Fourth Amendment requires that "the 'dis-

---

**3.** In *United States v. Ramsey,* 1977, 431 U.S. 606, 615 n.11, 97 S.Ct. 1972, 52 L.Ed.2d 617, the Supreme Court avoided consideration of the validity of a search under 19 U.S.C.A. §§ 482, 1581.

cretion of the official in the field' be circumscribed by obtaining a warrant prior to the inspection." *Almeida-Sanchez v. United States,* 1973, 413 U.S. 266, 270, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596. Here, Customs agents initially possessed a warrantless privilege and ensured by constant surveillance that none of the conditions that existed at the border changed. Thus, for the marijuana known to have crossed the border, the only difference *for Thompson* is that both he and the marijuana were removed temporally and spatially from the actual border crossing. Because of constant surveillance, the only discretion that may exist is that caused by temporal and geographical distances from the *physical* border to the actual seizure and search.[4] I do not believe such distances grant governmental agents "unfettered discretion" when because of constant surveillance (i) persons known to have brought an illegal cargo into the United States are still directly involved in transporting the cargo to its inland destination, (ii) nothing interferes with maintenance of the physical integrity of the

known contraband, and (iii) at the time of the initial border crossing a warrantless search and seizure could have been undertaken.

These remarks have been directed to those persons in the status of one such as Eldon Thompson. Although different Fourth Amendment questions and resolutions may be required for persons subsequently implicated in an illegal importing operation by the use of constant surveillance, such persons are not present here and need not be considered.[5] This is the crux of the issue presented by Thompson. He is complaining because Customs agents waited before conducting the search and seizure. However, that complaint overlooks the unchanged nature of this border search—save for time and distance. As such, this instance is analogous to an international flight under continuous surveillance carrying known contraband touching down in Brownsville, Texas solely for the purpose of refueling with no person or packages coming off or going onto the plane until its arrival at its destination in Chicago.[6]

4. Nonetheless, this discretion, as bounded by constant surveillance, is less broad than the authority granted Customs officers under 19 U.S.C.A. § 1581(a) which allows searches and seizures " . . . at any place in the United States . . . ." In this instance, constant surveillance allows this statute to avoid the pitfalls found to exist in those considered in *Almeida-Sanchez, supra,* and its progeny.

5. When others are implicated, their Fourth Amendment protections may necessitate different considerations and outcomes to the issues presented. See, *e. g., United States v. Warren,* 1978, 578 F.2d 1058 (en banc, reversing 5 Cir., 1977, 550 F.2d 219). However, when the Fourth Amendment's "reasonableness" requirement is viewed from the context of a case by case examination *and* the differing individuals seeking to challenge the reasonableness, those differing considerations need not necessarily apply for one in a position similar to Thompson's. To allow Thompson or one similarly situated to take advantage of the considerations presented by one subsequently apprehended by constant surveillance misreads the "reasonableness" criterion of the Fourth Amendment. Likewise, for purposes of the exclusionary rule which was designed to protect against governmental abuses in the Fourth Amendment area, that protection can be afforded just as adequately by its application—if necessary—to those previously unknowns ap-

prehended by the constant surveillance technique rather than its blanket application to the entire governmental operation.

6. This case may also be analogous to *United States v. King,* 5 Cir., 1975, 517 F.2d 350, in which customs officers in Birmingham, Alabama, opened letters mailed from abroad with Army and Air Post Office (A.P.O.) return addresses. The envelopes had entered the United States at San Francisco, California, and the defendant argued that the customs statute, 19 U.S.C.A. § 482, authorized searches only in border areas. This Court rejected that argument:

It is true, of course, that most customs searches take place in such areas, but the very words of the statute negate an interpretation that would deny to agents the authority "to search any trunk or envelope, *wherever found* . . .", assuming of course that the other requisites for a valid customs search are met (emphasis supplied). Additionally, the statute specifically empowers customs officers to make such a search, "as well without as within their respective districts. . . ."

*Id.* at 352. The Court also considered the constitutional implications of the search:

No court, however, has yet confronted the situation posed by this case, in which the

Where an illegal border crossing has occurred, I believe that the constant surveillance procedure as utilized here for an extended border search is a necessary and legitimate one within the Fourth Amendment's requirement of reasonableness.[7]

The essence of the constant surveillance procedure which I advocate here is that for one in Thompson's position, this procedure has maintained the integrity of the border conditions keeping the search and seizure within the governmental necessities of the border, see *United States v. Ingham, supra,* without trespassing upon the precious rights of the millions of Americans who scurry to and fro on the nation's highways and who must park on a motel lot.

GODBOLD, Circuit Judge, dissenting:

I respectfully dissent from part III of the opinion, which attempts to justify as a valid border search the seizure of two trucks and their cargo in a motel parking area in Atlanta.

The border was the dock in Savannah. Government agents knew that contraband had entered the country by boat at that border. They observed the contraband being off-loaded and re-loaded into four trucks, two of which were surveilled to Atlanta. There, 254 miles and two motels from the border, 20 hours after the contra-

band crossed the border, and in the absence of exigent circumstances, the agents seized the trucks. This was no search. The agents, thinking they had been identified as law enforcement officers, moved in to take possession of the vehicles and of the contents they had known was carried in them since they watched them loaded at dockside.

The border search doctrine permits warrantless searches made under standards less strict than the probable cause usually required by the Fourth Amendment. The rationale for this exception to the Fourth Amendment is national self protection against the bringing of contraband into the country. In *Carroll v. U. S.,* 267 U.S. 132 at 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 at 551–52 (1924), the Supreme Court said:

Travelers may be so stopped in crossing an international boundary, because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.

search does not take place at a port of entry or border area. The question for decision is thus whether, given that the search would have been reasonable by Fourth Amendment standards if it had taken place in the San Francisco post office, it became unreasonable as a result of being conducted in Birmingham.

*Id.* at 353. But we held that no Fourth Amendment rights were violated:

Here, the envelopes had passed an initial stage in the customs process when they were routed to Alabama, but they were still in the process of being delivered, and still subject to customs inspection. Therefore, the search did not violate appellants' Fourth Amendment rights.

*Id.* at 354.

**7.** While emphasizing that the border search exception to the Fourth Amendment is not based on the doctrine of exigent circumstances, the Supreme Court indicated a distinction for the *Almeida-Sanchez* line of authority which

involved searches within the interior of the continental United States.

"The Court of Appeals also relied upon what it described as this Court's refusal in recent years twice 'to take an expansive view of the border search exception or the authority of the Border Patrol. See *United States v. Brignoni-Ponce,* 422 U.S. 873 [95 S.Ct. 2574, 45 L.Ed.2d 607], (1975); *Almeida-Sanchez v. United States,* 413 U.S. 266, [93 S.Ct. 2535, 37 L.Ed.2d 596] (1973).' 176 U.S.App.D.C. 67 at 72, 538 F.2d, 415 at 420. But as the language from each of these opinions suggests, 422 U.S., at 876, 884 [95 S.Ct. 2574]; 413 U.S., at 272–273, [93 S.Ct. 2535], *plenary border search authority was not implicated by our refusal to uphold searches and stops made at places in the interior of the country; the express premise for each holding was that the checkpoint or stop in question was not the border or its 'functional equivalent'"* *United States v. Ramsey, supra,* 431 U.S. at 622, 97 S.Ct. at 1982. (Emphasis added).

In cases both timely and familiar the Court has continued to recognize the concept of our national interest in protection against contraband's being brought across our borders. In *Almeida-Sanchez v. U. S.,* 413 U.S. 266 at 274, 93 S.Ct. 2535, 2540, 37 L.Ed.2d 596 at 603 (1973), the Court said:

> The Court that decided *Carroll v. United States,* supra, sat during a period in our history when the Nation was confronted with a law enforcement problem of no small magnitude—the enforcement of the Prohibition laws. But that Court resisted the pressure of official expedience against the guarantee of the Fourth Amendment. Mr. Chief Justice Taft's opinion for the Court distinguished between searches at the border and in the interior, . . .

In his concurring opinion in *U. S. v. Brignoni-Ponce,* 422 U.S. 873 at 887, 95 S.Ct. 2574, 2583, 45 L.Ed.2d 607 at 620 (1975), Justice Rehnquist discussed *Carroll* in terms of the right to stop and search "travelers entering the country."

From Savannah to Atlanta, from border entry to seizure, the sole interest pursued was effective police work through which agents hoped to find the destination and the consignees of the contraband they had observed come across our border. I am as much in favor of good police work as my brothers. But the rationale which supports the relaxed standards for searches at the border was, in this case, wholly vindicated at the border where the material was unloaded from the ship that had entered the United States and re-loaded into trucks for land carriage. Agents saw the material and could have seized it but elected not to. From that time on the agents were not seeking contraband or persons bringing in contraband but persons within the United States with whom the smugglers were dealing. So far as I can determine the Supreme Court has never held that the desire to catch consignees, higher-ups and co-conspirators somewhere within the confines of the interior of the United States permits customs agents to carry border search authority around with them like a suitcase to whatever point at which they choose to make a seizure of goods that have been brought in illegally. The attenuated justification asserted in this case is an example of the "pressure of official expedience against the guarantee of the Fourth Amendment" to which Justice Stewart referred to in *Almeida-Sanchez.*

The majority opinion relies heavily on *U. S. v. Martinez,* 481 F.2d 214 (C.A.5, 1973), *reh. den.* 481 F.2d 1404 (C.A.5, 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 489 (1974). There, government agents had a tip that a described truck would cross the border carrying marijuana. A truck meeting the description was observed crossing the border but was not inspected at that time. Thus the border-related national interests referred to in *Carroll* were not vindicated at the border. It was never known whether the truck in fact contained contraband until it was searched several days later at San Antonio. Similarly in *U. S. v. Reagor,* 441 F.2d 252 (C.A.5, 1971), the search was conducted 60 miles from the border at a time when agents did not know whether there was contraband present.

In *U. S. v. Cristancho-Puerto,* 475 F.2d 1025 (C.A.5), *cert. denied,* 414 U.S. 869, 94 S.Ct. 181, 38 L.Ed.2d 115 (1973) there were repeated searches at the border. Immigration officials at Miami, suspicious of defendant's travel documents, took him into custody and searched him, without discovery of contraband, and stored his baggage. The next day he was arrested on a charge of fraudulent entry documents. Three days later he was fruitlessly searched again. After three additional days, on a tip that he had cocaine in his possession, he was searched the third time and cocaine found in his shoes. Agents then conducted their fourth search, of his stored luggage, and found more cocaine. We held searches three and four valid but on the narrow ground that defendant had never been "admitted" to the United States but with respect to his legal status was like a person "standing at the border." We relied on 8 U.S.C. § 1182(d)(5) which permits the Attorney General to temporarily parole into the

United States an alien applying for admission and such parole is not regarded as an admission into the United States. We held:

> On the precise facts of this case, we find this statute to be dispositive. We are not dealing here with an alien who has been placed in deferred inspection parole status and then allowed to remain either at liberty or at large. Rather, we hold only that an alien who is brought into the country under the provisions of this law and who is being held in physical custody by entry officials, having never for a moment been allowed to move about free of custody, continues to stand at the border for customs and border search purposes. Nor do we suggest that his special legal status could be continued indefinitely. If the entry officials allow the alien to remain at large pending investigation under the statute, the alien would not remain at the door.

> \*　\*　\*　\*　\*　\*

> Finally, we do not mean to imply that there could never be a period of time for which an alien is held under the statute that would be too long to be reasonable. Here, appellant was searched one week after his physical entry into the country. Because the search occurred only one week later, at a time when the alien had been held in continuous physical custody by entry officials, pending prosecution and pursuant to section 1182(d)(5), we hold that the search was a border search.

475 F.2d at 1028.

We have rejected the argument that once a vehicle has been examined at the border a subsequent search may be based upon probable cause and may not be based upon facts giving rise to reasonable suspicion which come to light after the initial border search, but under circumstances where the second search was independently justifiable as a border search. *Morales v. U. S.,* 378 F.2d 187 (C.A.5, 1967) (cursory search of car at bridge, after intervening suspicious circumstances car seized near bridge, taken to station at border and thoroughly searched). In *U. S. v. Maggard,* 451 F.2d 502 (C.A.5, 1971), the car was given a cursory search at

a checkpoint eight miles north of the border. The suspicions of agents were aroused when the car drove away from the checkpoint because the rear was riding low. They followed the car and searched it two miles and a few minutes away. The defendant was not immune on the basis that he had cleared the first customs search.

Time and distance are important in analyzing the validity of an alleged border search conducted away from the border. But an even more significant factor is whether the interests which justify border search have been fully vindicated at the border. Once these interests have been met, they should not be reasserted to justify an otherwise illegal seizure far inland.

MEHRTENS, District Judge, dissenting as to Part II.

I respectfully dissent from the court's opinion in Part II holding that the seizure and search of Thompson's truck in the motel parking lot were violative of his Fourth Amendment rights.

I also disagree with the majority's holding that *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), is limited only to highway stops. Although the car in *Chambers* was stopped on the highway, it was then driven to a police station where the search took place.

The majority opinion in Part II overlooks the unassailable logic espoused in *Chambers* where the Supreme Court stated:

> "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

> "　.　.　. The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is se-

cured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." 399 U.S. at 52, 90 S.Ct. at 1981.

The Supreme Court in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), although holding the search of the car at the police station invalid because of the lack of probable cause, emphasized:

"The measure of legality of such a seizure is, therefore, that the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes has contraband . . . therein which is being illegally transported."

No point was made of the fact that the automobile had been towed to the police station and that "there was no way in which he could conceivably have gained access to the automobile after the police arrived on his property." 403 U.S. at 460, 91 S.Ct. at 2035. The court emphasized that "surely there is nothing in this case to invoke the meaning and purpose of the rule of *Carroll v. United States* [267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 546] . . . No contraband or stolen goods or weapons, no confederates waiting to move the evidence." 403 U.S. at 462, 91 S.Ct. at 2035. In contrast, here there was contraband, approximately 3,000 pounds of marihuana. The majority has failed to respect the distinction between the holding in *Coolidge* with respect to non-contraband goods and the holding in *Carroll* that "contraband goods concealed and transported in an automobile or other vehicle may be searched and without a warrant." 267 U.S. at 153, 45 S.Ct. at 285. The marihuana constituted contraband within the statutory definition, 26 U.S.C. §§ 4741(a), 4744(a)(2), 7302; 49 U.S.C. §§ 781, 787(d).

In *Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975), defendant was arrested at a bank drive-in window. The officers directed him to park his car at the curb. He was arrested and one officer drove him to the station house while the other drove his car there. After questioning defendant, the officers then searched his automobile and discovered incriminating evidence. The Supreme Court, finding that there was probable cause both for the arrest and for the search of the vehicle, either at the scene or at the station house, stated:

"In *Chambers v. Maroney* we held that police officers with probable cause to search an automobile on the scene where it was stopped could constitutionally do so later at the station house without first obtaining a warrant. There, as here '[t]he probable-cause factor' that developed on the scene 'still obtained at the station house'. 399 U.S., at 52, [90 S.Ct. 1975] . . . .."

Here, as in *Chambers* and in *Texas* where the cars were searched at the police station, there was no way in which the defendant or an accomplice could conceivably have gained access to it after he was arrested. The fact that Thompson's car was seized in the motel parking lot has no legal significance. The same arguments of exigency, immobilization on the spot and posting a guard were present, and its contents constituted contraband. The approach also minimizes the reality of the circumstances. The agents were eyewitnesses to the unloading of the bundles from the "ODESSA" into the trucks which were kept under constant surveillance. The circumstances make especially appropriate the pronouncement of the Supreme Court in *Carroll, supra,* "The measure of legality of such a seizure is therefore that the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes has contraband . . . therein which is being illegally transported."

Thompson contends that probable cause to search the truck existed for several hours prior to his arrest and that, therefore, there were no exigent circumstances. I know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing an automobile under exigent circumstances are foreclosed if a warrant was not obtained at the first

practicable moment. The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action. In the case *sub judice* the officers had probable cause to believe that Thompson's truck had been used to transport marihuana from the "ODESSA" docked in Savannah to the Motel One in Atlanta. A substantial quantity of marihuana was seen by the informant on the "ODESSA" and he assisted the other defendants in loading it into the four trucks. In fact, one of the trucks belonged to the informant. The agents did not intend to search the trucks at the motel in Atlanta but planned to continue their surveillance to the point of delivery. Only when it became apparent that the defendants knew of the surveillance were the arrest and seizure effected. The truck and its contents were seized immediately after the arrest of the Thompsons.

This Court in *United States v. Soriano*, 497 F.2d 147 (5th Cir. 1974), citing *Chambers v. Maroney, supra,* stated that:

> "*Chambers* teaches that where automobiles are concerned, circumstances which justify an immediate seizure as reasonable justify an immediate search as well. Id. at 149."

The majority correctly approves warrantless searches of vehicles in motion when seized. On the other hand, warrantless probable-cause searches of vehicles parked in a public place, but movable in some circumstances, are invalid without proof of exigent circumstances or a search warrant. It would seem from the holding that when law enforcement officers discover a vehicle parked in a public place that they have probable cause to seize and search, they must not immediately do so but must first seek a warrant. If, however, before the warrant arrives, the car is put in motion by someone, it may be searched on the spot or elsewhere. In the case before us Thompson's truck parked in the motel parking lot could not be searched without a valid warrant, although if Thompson had been arrested as he started to drive away from the motel, immediate seizure and search of the truck would have been reasonable under the Fourth Amendment.

I am unable to find anything in the language or underlying rationale of the cases from *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 546, to *Chambers v. Maroney, supra,* limiting vehicle searches as the court now limits them in situations such as the one before us. Although each of those cases may have involved vehicles or vessels in motion prior to their being stopped and searched, each of them approved the search of a vehicle that was no longer moving and with the occupants in custody no more likely to move than the unattended but movable truck parked in the motel lot.

For Fourth Amendment purposes, the difference between a moving vehicle that has been stopped on the highway and a movable truck parked in a public parking lot is tenuous at best. In my opinion, it is a metaphysical distinction without roots in the common sense standard of reasonableness governing vehicle search and seizure cases.

Accordingly, I would hold that the seizure and search of Thompson's truck were not under the facts unreasonable or violative of his Fourth Amendment rights.

In addition, even assuming that a warrant was technically required, I am of the opinion that the marihuana seized should not be excluded from evidence. The so-called exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights, generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Therefore, as with any remedial device, the rule should only be applied in cases where the primary objective, judicial integrity, or deterrence of police misconduct is most efficaciously served. *United States v. Calandra, supra.*

The defendant is entitled only to a fair trial, not a perfect one. *Michigan v. Tucker*, 417 U.S. 433, 446, 94 S.Ct. 2357, 41

L.Ed.2d 182 (1976). It would be most unrealistic to expect law enforcement officers, subjected to pressures and unexpected actions, to make no errors whatsoever. It would seem imperative, therefore, before police error is penalized, that it be considered whether the sanction is fair to the law enforcement officer, the general public, the aggrieved person and to the need for an effective determination of the truth at trial. In this case the officers were acting in good faith when they arrested the defendant, seized the truck which they knew contained marihuana, and searched it. There was no willful or negligent conduct by them which deprived the defendant of some right. The majority's finding of an illegal search and seizure, for all practical effects, frees the guilty defendant. The disparity in this case between the asserted error committed by the police and the windfall afforded the guilty defendant by application of the rule is contrary to the concept of proportionality essential to the concept of justice, creating public disrespect for the law and the administration of justice. The policies underlying the Fourth Amendment exclusionary rule are neither absolute nor all-encompassing. Weighing these policies against an equally compelling policy, the necessity for an effective determination of truth at trial, I would not exclude from evidence the 1,500 pounds of marihuana found in the defendant's truck. By doing so the truthfinding process is deflected and the guilty may go free.

The dissenting opinion of Chief Justice Burger in the 5–4 decision of *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) emphasizes the importance of applying "the exclusionary rule on the basis of its benefits and costs, at least in those cases where the police conduct at issue is far from being outrageous or egregious," 430 U.S. at 427, 97 S.Ct. at 1254.

So serious an infringement with the crucial truth-seeking function of a criminal prosecution should be allowed only when imperative to safeguard constitutional rights. See *Id.* at 425–26, 97 S.Ct. 1232.

Thus, the lack of "egregious" injury to the defendant Thompson's constitutional rights is an added ground for not excluding the marihuana seized from his truck with probable cause. To do so would suppress the truth when the threat to justice is slim.

I am of the opinion that on reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief reasonably arising out of the circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid. The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interest as well as the interest and rights of individual citizens. *Carroll v. United States, supra*; *United States v. James*, 432 F.2d 303 (5th Cir. 1970), *cert. denied*, 403 U.S. 906, 91 S.Ct. 2214, 29 L.Ed.2d 682.